We have an admission this morning. Mr. Decker, would you please approach the podium? It is my great pleasure to move the admission of Philip K. Decker to the Bar of the Court of Appeals for the Federal Circuit. Mr. Decker is a member of the Bar in good standing of the highest court of Virginia. I have knowledge of his credentials. I am satisfied that he possesses the necessary qualifications. I have observed Mr. Decker in action for the past year, year and a half in my chambers and can personally attest to his qualifications to be a member of the Bar of this court. So I'm very pleased to move his admission. Now I inquire of my colleagues if they are willing to act on the motion. Well, we're going to have to deliberate for a while on this, I'm afraid. I took a poll of my current and former law clerks and they were a little iffy. No, we are welcome to have Mr. Decker. Do you agree? I have no questions at all. We're happy to have you. The motion is granted and welcome to the court. Indeed, welcome to the Bar if you will approach the deputy who will administer the oath. Do you solemnly swear or affirm that you will comport yourself as attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I will. Welcome to the Bar of the United States Court of Appeals for the Federal Circuit. Thank you. You're welcome. Thank you. Thank you, Your Honor. Welcome. Thank you, Your Honor. We'll proceed with the next argued case this morning. Number 13, 1487, Operating Systems Solutions against Apple Incorporated. Mr. Harrison. May it please the court. Brian Harrison, Morris, Manning & Martin on behalf of Operating Systems Solutions. Your Honors, we're here today on a plain construction dispute in which the district court on numerous occasions improperly relied upon the patentee as a lexicographer. Mr. Harrison. Yes. It seems to me that it at least is to two of the three important constructions. Your argument is that the order in the court conflated the limitations, selected portions of main memory contents and selectively storing portions of main memory contents. That is correct. Okay. Prior reference, quote, does not teach a store operation based on contents of memory. I'm adding that emphasis. But instead is directed to a conditional store operation of the entire main memory based upon the size of the memory. In other words, the present invention is quite different from the prior reference. I add that. Which teaches storing all memory in one operation based on size of the memory. Your Honor, applicants submit that the present invention is quite different from the prior reference teaching in many respects, such as the selective storing of each portion of memory based upon a check of contents of that portion. How is that statement not a conflation of those two terms? Your Honor, that discussion is in the concept of storing BCI, which is what this patent is directed to. And what they're explaining in that is the selectively stored memory contents. The selection in the patent itself of the memory contents is based upon whether a predetermined condition exists. And in particular, in the preferred embodiment, it talks about whether a registry entry has a certain value as determining whether there will be stored contents. Selectively storing then is an optimization of the saving of those selected contents in which a zero value is not stored and simply a placeholder exists such that you're not having to save zero values and take up memory space and it makes it much quicker. What evidence supports those proposed constructions? In column 5, starting at, which is A31, starting at line 5 and continuing through line 25, where it talks about the operation of saving the boot configuration information to a disk. It says the contents of a memory block of a predetermined size are first examined and then saved to the disk if the memory block is satisfied with the predetermined criteria. It then goes on to explain that the saving process, after you make the determination whether it meets the predetermined criteria, goes through and checks each memory content of the BCI to be stored to determine whether it has a zero value. But what about the phrase right there that says that you determine whether it has a zero value while scanning every memory segment? Of the BCI is what it's talking about there. The whole discussion there is talking about how you save a block of memory that comprises the BCI. It's not talking about saving the entirety of the memory and scanning the entirety of the memory. In fact, it would be somewhat nonsensical since the post operation sets all the values of memory to zero. And then the BIOS, depending on what flavor of BIOS you're running, whether it's PC BIOS or some other basic input-output system, then goes through and creates configuration information as part of the booting process that is saved to known locations in memory. It is those known locations in memory then where that information is saved that if the registry value in the preferred embodiment is a certain predetermined condition, then it goes back and runs through those known memory locations and saves all non-zero values. This is written entirely for DOS, is it not? The preferred embodiment talks about DOS, BIOS, Windows 95. But importantly, the specification also says that though the descriptions herein may refer to terms commonly used in describing particular computer systems and software, such as IBM Personal Computer and Windows 95 operation systems, the concepts equally apply to other systems and software. So clearly here it's not limited just to PC DOS-based BIOS. At the time, that was the easiest preferred embodiment for them to walk through. It was well-known and well-used by many people at that point in time. Let me switch terms. Well, first let me ask you, if we were to agree with you on that construction but disagree with you on all the others, what claims do you survive? If you agree with me on any of the selected portions of main memory, selectively stored portions of main memory, or boot process, then we're back on remand. In order for Apple to prevail, they need to win those three terms. The rest of the terms then, it's going to be a hodgepodge of whichever claim has what term in it. And we're going to have to determine based upon whatever construction we get as to what claims survive. All right, let me ask you about boot process then. Is it your position that boot process has no end? No, that's exactly the misconception that the district court has. Boot process has a defined end. It doesn't have a defined end in terms of time. It has a defined end in terms of the operations that occur. All of the operations that occur as a direct result of pressing either the power button or reset button are part of the booting process. That includes starting of services, although not operations that occur as a result of the starting of services. And other operations that occur, it's undisputed that operations continue to occur after the user is presented with a login screen or after the user is, if there's no login screen, after the user has been presented with a desktop. There are still background operations occurring that are setting up that system that are happening after those two events happen. All right, and what are the background things that are occurring after setting up the system? Well, for instance, files that are run in autoexec.bat. Those are application files that are being run automatically. Those files may not, those applications may not be completed running, but that is not going to prevent necessarily the user being presented with a login screen. Well, where in the patent do you explain that? Because, you know, you do specifically discuss what the booting process is. It talks about what the booting process is generally. And then it also talks about how programs that are being run by reason of their being included in the autoexec.bat file are also part of the booting process. Those applications. Look at figure five, for example, or even figure four. What, I mean, you've got the user application at the end of the line. So where do you explain that a lot of other things are going on after the user application? Well, one of the workers in the art would understand that the autoexec.bat file, which is running processes, could still be running even during steps F41 and steps F42. Okay, and what testimony did you present to that effect? Our expert witness testified to that. What about the court's conclusion that you actually defined the booting process specifically in the patent? That is a misapplication as the patentee is a lexicographer. Nowhere in this patent is there a clear and unambiguous statement that booting process ends when the user application is available. And in fact, the expert for Apple said that it ended actually even before then. He said it ended sometime during F41. But you have a patent here that tells us that it has a purpose, and the purpose is to bring the system up to a usable state for the user. And you say, when power is applied to the computer system, the computer system starts to be booted to load an operating system and thus is brought into a known useful state in which application programs can be executed. This procedure is generally called booting. And then you go on to say that your whole patent is about a boot process. That is correct. However, that again is simply a general description of the process of booting. It does not say booting ends when a user application is available for use. Nowhere in the patent does it say anything close to that in terms of having the unequivocal disclaimer of scope that one of ordinary skill in the art would bring to reading this patent in view of the autoexec.bat feature as one example. Okay, let me take you down farther in column one. Now you're at lines, it looks like about 58 through 60. And it says, finally, another ASC2 file called autoexec.bat is loaded and then programs that are listed therein are executed thereby preparing the personal computer for use. Again, you're emphasizing the point is that you're getting the personal computer ready for use. Correct, but the computer can be ready for use before the end of the booting process. There's nothing in the patent that says that can't happen. In fact, the autoexec.bat file specifically would allow that to happen depending upon the nature of the application that's included in that file. Let's hear from the other side and we'll save you rebuttal time, Mr. Harris. Ms. Maynard. May it please the Court. Deanne Maynard for Defendant Apple. The district court correctly construed all of the challenge claim terms, but this court need affirm only three of them in order to affirm the entire judgment. What if we disagree with you on the second one, the selected portion? On the selected portions of main memory content, Judge O'Malley, on page 19 of the red brief, we have a chart setting forth which ones. And so if you disagree with us only on the selected portions one, that would leave open the claims set 33 to 36 and 55 to 56. But you shouldn't disagree with the district court on that because the specification and the prosecution history make clear that in order to pick the contents that are going to be saved, every portion of memory must be searched. But does it make sense if you've already got a boot configuration information saved? Does it make sense to go back and look at portions of the memory that were not in that boot configuration? Well, the question about selecting the portions, Judge O'Malley, occurs when you are going to save a boot configuration information. So the way that Column 5 works, it explains that selection. And respectfully, my colleague is misreading Column 5. The only way to read this paragraph that starts at line 5 of Column 5 is as the process that selects the contents that are going to be stored of the whole memory. And then that content is the selectively stored. They concede in their reply the contents are the same. And I'll move to the prosecution history next, but I wanted to start with the specification. This paragraph, and so my colleague points to the sentence, the contents of memory block of a predetermined size are first examined and are then saved to the disk if the memory block is satisfied with the predetermined criteria. And to suggest that the first step and then two sentences later is a different step, there's no support for that. The way this patent is read, the non-zero content search is the predetermined criteria that's being referenced in the first sentence. And that's made clear if one goes down line 11, to be specific. So in other words, we're now being specific. We're giving the example in this embodiment of the predetermined criteria. And that predetermined criteria is the non-zero content. And that search is done while scanning every memory segment, Judge O'Malley, not every portion of the BCI, which is how they want to read it, but every memory segment. And that is shown in the figure 6 on page A28. It starts, is there a request to save contents of memory? In other words, are we going to store a BCI? If yes, we're going to search the memory segment, every memory segment, as the column explains. And that's completely consistent with the prosecution history. Where, in the part that Judge Wallach referred to, in order to overcome multiple rejections, the patent, the applicant said, we are different from Lay. Lay searches the memory for size. We're searching each portion of memory for content and saving only some of that content. That, and as he says, that's talking about selectively stored. But they also clearly equated these two terms in the prosecution history. And that's clear from the two previous pages, which is A3146 and A3147. Starting in the middle of A3146. What's happening here is the examiner had rejected certain claims over Shinjo. And the applicant had come back and said, no, these claims are different because these claims involve selective storing. And the examiner said, I don't see anything in these claims directed to selective storing. And what does the applicant say? The applicant says, oh yes, there is language in these claims that is the same process as selective storing. And then equates the two terms. And the content is the same. And I'll walk you through where that is. So in the middle of page A3146, this is the applicant talking, so this is very significant, the applicant talking in the prosecution history, laying forth for the world what their patent covers. The examiner stated in the office action that there is no claim language directed to the selective storing of the content of main memory in these specific claims. Applicant respectfully disagrees and submits that all of these claims include language that is directed to such an operation, to the same process, not a different process, not different searching, same searching, and then gives multiple examples. And significantly, those examples make clear and equate the two claim terms that issue before this court, equate the selective content with the selectively stored. And for example, two of the clearest examples of that  claim 28 includes restoring step B that calls for a restore of boot configure information comprised of, in quotes, selected memory content. Applicant submits that this language, selected memory content, is directed to selectively stored memory content. These two claim terms are synonymous. They equated them in the prosecution history. There's nothing in that discussion in column five that suggests two separate steps that they're telling this court about. And indeed, in the district court before the special master, they adopted their claim construction briefing for one term for the other. They equated these two terms even then and only started to try to split them after they lost before the special master. And there's just no basis to treat these terms differently. Nothing in the patent anywhere to suggest this two-step process that they're claiming now. And the only explanation in the patent for this process of how the information is selected to select a portion of the memory to become the boot configuration information is that every memory segment is scanned. So there's no contrary embodiment in the patent to this prosecution history language that clearly equates the two. All right, let me ask you about boot process. Yes. In looking at your expert's testimony, it seems to me that instead of your expert testifying as to what a boot process would mean generally to one of skill and the art at the time, your expert was purporting to engage in claim construction. So do you believe that you had testimony that said separate and apart from the patent that the term boot process or booting process had an understood meaning in the art? I think, Your Honor, with respect to... So I agree with you that the expert does examine the patent, which is appropriate for one of skill and the art, would look at the patent to see what the term means. But he does say in paragraphs 13, 15, and 17 that this understanding that he's deriving from the patent is consistent with what one of skill and the art would understand booting process to mean. But we don't need the expert's declaration here to affirm the district court's decision because this is as clear as a lexicography as one gets. In column 1... I'm trying to understand why this matters. I mean, is it true that the booting process normally really doesn't end with the presentation of the user interface? No, our expert testified that if that was consistent with how one of skill and the art would understand it. And it matters because they've conceded that if that's the end, there's no infringement. In the MAC system, when does the booting process end? I beg your pardon? So when does the booting process end in the MAC system, in your system? I'm trying to understand why this matters to infringement. Well, they've conceded that we don't infringe under this definition. Right, so your booting process doesn't end at that point. I'm trying to understand when yours does. I don't know the answer to that standing here, Your Honor. But the patent clearly gives an end in the definitional phrase in the patent where it says this is generally called booting. This process is generally called booting. And in particular... In the language, Your Honor, pointed to my colleague, starting in line 31 of column 1, when power is applied to the computer system, the computer system starts to be booted to load an operating system, and thus, concluding, thus, is brought into a known useful state in which application programs can be executed, this procedure is generally called booting. It's a definitional phrase. Booting is in quotes. This court's case law says that's the way you define something. And not only that, it's consistent with the rest of the patent. So the same definition, it's consistent with the description in the summary of the invention in column 3, the first full paragraph, which starts at line 6, to achieve the object, the present invention. Also, describing the entire invention, not describing any kind of embodiment, the present invention, in the summary of the invention, provides a method for quickly booting a personal computer system. And then it ends with loading a graphic user interface GUI program. That's consistent with the definition. That's consistent with the figures. All of the figures end with running the GUI program on A26 in figure 4. And this is consistent with what our expert testified. The expert testified in his definition at A4583 that at the beginning of the running of the GUI program is the end of the boot process. So the District Court's claim construction is clearly correct. It is a matter of ordinary meaning and as a matter of this patent.  to reverse it because there's nothing in this patent that describes a booting process that goes on. And in fact, although they claim that their booting process has an end at some point, their expert testified that it could go on for weeks or months under his theory. And there's nothing in the patent that suggests that. A batch execution can be a lot of things, can it not? I mean, it can relate to virtual programs, for example, and starting them up. It doesn't have to be the booting of the computer. Well, in this patent, the autoexec.bat file is shown running before the end of the boot process. So both in the descriptions of the columns where Judge O'Malley was reading at the bottom of column 1, and then also, so that's where Judge O'Malley was reading from starting at like line 58 in column 1 where it says, finally, another ASCII file called autoexec.bat is loaded and then programs that are listed therein are executed, thereby preparing the personal computer for use, ending with that. So the patent contemplates that the relevant autoexec.bat files have run. The figures are that way too. The autoexec.bat files, when they do run, so sometimes they skip them, that's the point of the patent, sometimes they skip them, but when they are run, they're run before the loading of the GUI in the figures. And significantly too, I mean, the whole point of this patent is to, is a quick boot. So how will you know, it needs an end, that's the whole point. It's a quick boot. It's going to be quickly ending. And so it's important to have an end. It's not surprising that the definitional phrase they gave in the patent has an end. Let me ask you one other question. I don't know how much time we have left. We're still okay. Area necessary for system operations? Yes, Your Honor. And this is just a, maybe I just don't understand, but can an area have contents that are necessary for system operations as well as contents that are not necessary for system operations? Well, I think the two would be mutually exclusive, which is the point. That's what I'm trying to figure out. I think the two are mutually exclusive, which is the point of the saying, the extended memory, which the parties have conceded, or have agreed, means the portion of memory that's not used prior to storing or restoring the BCI. So essentially you can boot this computer, you can use this method without using the extended memory. So as the district court correctly reasoned, if it's not used prior to those things, then clearly it's not part of the area of the memory necessary for system operation. Any more questions for Ms. Maynard? Thank you, Ms. Maynard. We would request you affirm the judgment, Your Honor. Mr. Harrison? Yes, Your Honor. If I may briefly, first to address the area necessary for system operation issues. The mistake that the district court made with respect to that is exactly the mistake that Apple argues in their brief. And that is, it equates the end of the booting process with the point in time in the booting process where information is either stored or restored. There are a number of steps that occur after that that are necessary for system operation. And in fact, one of the things that is necessary for system operation in the preferred embodiment is the use of extended memory because it talks about you have to load the Windows 95 specific drivers through the use of extended memory. You can't get to the end of the booting process even if they've defined it without loading those drivers. So, therefore, saying that it doesn't include extended memory actually disclaims the preferred embodiment and cannot be correct. There's a number of other reasons we address in our brief on that issue. With respect to the point being made about the file history and the equating of the selected portions and the selectively stored portions, they are the same contents. Nowhere does it say they are the same thing in terms of how you get there. The patentee, the applicant, was explaining to the PTO, the examiner, that they are the same contents. Now, one last point. I mentioned it on my initial argument, but I want to bring back the issue again. With respect to the end of the booting process, Apple's expert said it was at the start of the GUI. The district court said it's when a user can use an application, which is two steps down the road from that. So, in terms of where does the booting process end? The booting process ends when all of the operations that are necessary that have happened as a result of pressing the power reset button ends. How does that square with your expert saying that it can go on for days or weeks? Well, simply put, it could. If you decided to go against the exact teaching of this patent, which was to speed up that process. If you chose to stick huge files that took days, weeks, months to run into an auto exec program, which clearly won the skill in the arm, which it would not do when you're trying to speed up the process of booting. It could do that. However, one of skill in the arm would know that that would be directly contrary to the teachings of this patent, would vitiate the purposes of this patent. The purposes of this patent are to get the computer system up and running as quickly as possible. And it does that by utilizing stored configuration information called CCI when there have been no configuration changes to the computer, rather than once again running through the programs that would result in those same configuration entries into the memory. One last point. Apple had argued that the predetermined condition for selected portions is the memory contents. That's inaccurate. The patent is clear. The patent is clear. The predetermined condition for selected portions is set forth in column four, starting at line approximately 57. And it says, at the interrupt point, the contents of a particular register is sent to the RAM resident program and then performs a prescribed function associated with the register contents S37. If the register contents is a predetermined value, for example, 1605 hash, the RAM resident program checks if there is a file that contains the boot configuration information in a disk and saves the current boot configuration information to the disk, if not. That has nothing at all to do with what the contents of the boot configuration are. It simply is what is that registry value that tells us whether we have selected portions of memory contents or not. Thank you. Thank you, Mr. Madison. Ms. Maynard, the case is taken under submission.